**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____x        Case No.:  16-bk-12356-jlg

In re:

                                                 Chapter 13

NEELAM TANEJA,

            Debtor/Plaintiff,            **Adversary Proc. No.:  17-ap-01027-cgm**

vs.

THE HEALTH LAW FIRM, et al.,

            Creditor/Defendant.

_____x


### <u>AFFIDAVIT OF GEORGE F. INDEST III CONCERNING AMOUNT OF AND</u>

### <u>REASONABLENESS OF ATTORNEY'S FEES AND COSTS</u>

I, the undersigned, George F. Indest III, President and Managing Partner of The Health Law Firm, being duly sworn, do hereby depose and state:

1.      I am the President and Managing Partner of The Health Law Firm, located in Altamonte Springs, Florida, a suburb of Orlando.

2.      I have been an attorney for more than 36 years.  I am a member of the bars in Florida, Louisiana and the District of Columbia.

3.      I am the President and Managing Partner of the Health Law Firm.  In addition to my J.D. from Tulane University, I have an LL.M. from the National Law Center, George Washington University, Washington, D.C.  I am also board certified by The Florida Bar Committee on Legal Specialization in the Legal Specialty of Health Law.

4.      In addition to the state courts in which I am admitted to practice, I am also currently admitted to practice before 13, different federal courts.  A list of the courts to which I am admitted is part of my resume, attached as Exhibit "A."  I consider myself to be an experienced litigator.

5.      I have been retained as and testified as an expert on the issues of attorney's fees and costs in the past.  I have taught courses for The Florida Bar that included the subject.  I am also a member of the National Association for Legal Fee Analysis (NALFA) and have a "Certificate in Reasonable Attorney's Fees" from NALFA.

# EXHIBIT 19

6.      I have reviewed the invoices associated with the time spent in defending against Plaintiff/Debtor Neelam Taneja Uppal's Adversary Proceeding she commenced in th present Bankruptcy proceeding.  These are the ones attached to Exhibit "17" the affidavit of our Assistant Book Keeper, Michelle Williams.  These are accurate and reflect time and costs that were actually incurred.

7.      Originally Invoice 1 (attached as Exhibit "A" to Exhibit "17") included my time at the rate of $550 per hour.  However, we have reduced that fee to $475.00 per hour, which is the rate agreed to by the Plaintiff Debtor when she originally retained this firm in June 2012.

8.      I am familiar with the fees charged by attorneys for similar work in the Orlando, Florida area, where I am currently located.  The rate of $475.00 per hour for an attorney of my experience is considered to be reasonable.

9.      I have also researched the fees charged by attorneys in New York, New York, for similar work.  My research and review have included, review and analysis of:

a.      Burdge, Ronald L, United States Consumer Law Attorney Fee Survey Report (June 2017), specifically the attorney's fees for New York, New York, and Orlando, Florida (pp. 1-17, 212-213, 294-295) (attached as Exhibit "B");

b.      National Law Journal Survey:  Billing Rates Across the Country: The National Law Journal's Annual Survey of Law Firm Billing Rates for Partners and Associates (Law Journals Press, New York, Jan. 13, 2014) available at:  http://www.nationallawjournal.com/id= 1202636785489/ Billing-Rates-Across-the-Country?slreturn=20170602163755;

c.      Tatum v. City of New York, 2010 U.S. Dist. LEXIS 7748 (S.D.N.Y. 2010) (Case No. 06-cv-4290-PGG-GWG);

d.      Lora v. J.V. Carwash Ltd., 2015 U.S. Dist. LEXIS 155954 (S.D.N.Y. 2015 (Case No. 11-cv-9010-LLS-AJP);  and

e.      Coalition of Immokaalee Workers, Inc. v. Town of Palm Beach, 2016 U.S. Dist. Lexis 179286 (S.D. Fla. 2016).

This research indicates that a rate of $475.00 per hour for an attorney with my experience is fair and reasonable in bankruptcy defense of creditors in New York, New York.

10.      The time spent of 114.8 hours is reasonable based on the work this case required in defending against the allegations brought by the Debtor/Plaintiff and the time required to travel

to and from New York. I do note that 11.0 hours of this amount are included as the projected fees to be incurred in preparing for, traveling to and attending the hearing on July 13, 2017.

11.    The costs incurred of $2,905.33, the majority of which were travel expenses (including the projected travel expenses for the hearing on July 13, 2017) are also fair and reasonable and authorized by case law.

12.    The total of the costs and fees of $57,435.55 is fair and reasonable, whether incurred in the Orlando, Florida, area or in the New York, New York, area.

13.    I have personal knowledge of the foregoing. I am an adult and competent to make this statement.

**FURTHER AFFIANT SAYETH NAUGHT.**

**GEORGE F. INDEST III, PRESIDENT
THE HEALTH LAW FIRM**

## NOTARIZATION

STATE OF FLORIDA            )
COUNTY OF SEMINOLE          )

BEFORE ME, the undersigned authority, personally appeared GEORGE F. INDEST III, who is personally known to me, who after first being duly sworn, deposes and says that the foregoing is true. Sworn to and subscribed before me this 3rd day of July 2017.

PARRIS L. TURNER
Commission # FF 997971
Expires June 1, 2020
Bonded Thru Troy Fain Insurance 800-385-7019

(SEAL)

NOTARY PUBLIC:

Signature of Notary Public
Name of Notary (printed): Parris Turner

Exhibit A:    Resume of George F. Indest III

Exhibit B:    Burdge, Ronald L, <u>United States Consumer Law Attorney Fee Survey Report</u> (June 2017), showing attorneys fees for New York, New York, and Orlando, Florida (pp. 1-17, 212-213, 294-295)

GFI/gi
C:\Users\gindest\Desktop\TEMP TEMP UPPAL\Affidavit-Indest-Atty Fees-BR-Adv Proc.wpd

# GEORGE F. INDEST III, J.D., M.P.A., LL.M.
**Board Certified Health Law Attorney**
(rev. 4/17)

The Health Law Firm
1101 Douglas Avenue
Altamonte Springs, FL 32714
Telephone:  (407) 331-6620
Telefax:  (407) 331-3030

## EDUCATION

GEORGE WASHINGTON UNIVERSITY, NATIONAL LAW CENTER        WASHINGTON, D.C.
  Master of Laws (with highest honors), September 1986.
Course emphasis in Health Care Law (Legal Medicine) and International Law.

UNIVERSITY OF WEST FLORIDA GRADUATE SCHOOL              PENSACOLA, FLORIDA
  Master of Public Administration, August 1982. G.P.A. 3.85/4.00.
Course emphasis in public personnel management and administration.

TULANE UNIVERSITY LAW SCHOOL                      NEW ORLEANS, LOUISIANA
  Juris Doctor (cum laude). Class Rank: 22/179.
Course emphasis in Admiralty and International Law.

TULANE UNIVERSITY                                NEW ORLEANS, LOUISIANA
  Bachelor of Arts.
Majored in Political Science with strong background in Computer Science.

## JURISDICTIONS IN WHICH ADMITTED

-Louisiana: Admitted to practice in Louisiana
-Florida: Admitted to practice in Florida
-District of Columbia: Admitted to practice in District of Columbia
-List of all courts to which admitted is attached.

## LEGAL EXPERIENCE

1999 - Present:  President & Managing Partner of The Health Law Firm.  Firm represents primarily healthcare professionals in business, contractual, administrative, licensing and litigation matters.  Litigation includes state and federal courts (plaintiff and defense) and state and federal administrative tribunals. Clients include physicians, nurses, dentists, medical groups, nursing homes, hospital chains, and other health care professionals and facilities.  Offices in Altamonte Springs, Orlando and Pensacola.

**EXHIBIT A**

1997 - 1999:  <u>Shareholder, Partner, Head of Business and Health Law Department, Unger, Swartwood, Indest & Acree, P.A.</u>  Business, corporate, transactional, regulatory and administrative practice for physicians, hospitals, nursing homes, home health care agencies, managed care organizations and insurers.  Professional liability and business defense litigation.  Supervised work of two other attorneys and two paralegals in this medium sized Central Florida firm with offices in Orlando and Jacksonville.

1995 - 1997:  <u>Health Care Attorney, Baker & Hostetler</u>, Orlando, Florida.  Member of Business Department, Firmwide Health Care Industry Group, and Mergers and Acquisitions Team in large, national firm.  All aspects of business, corporate, transactional, regulatory and administrative law practice for physicians, hospitals, nursing homes, home health care agencies, managed care organizations and insurers.  Formation of all types of business entities and not-for-profit corporations, professional associations and IPAs; drafted health-related business contracts of all types.  Litigation involving defense of medical personnel, professional licenses, nursing home liability and administrative hearings.

1993 - 1995:  <u>Litigation and Health Care Attorney, Taraska, Grower & Ketcham, P.A.</u>, Orlando, Florida. Associate in medium size Central Florida defense firm representing large number of hospitals, medical malpractice carriers, physicians, IPAs and medical associations among its major clients.  Practice concentrated in medical malpractice defense, personal injury and insurance defense litigation;  health care law;  appellate practice.  Advised clients on self-referral prohibitions, fraud and abuse laws, federal antitrust policies, and other regulatory initiatives.  Represented institutional providers with respect to medical staff issues, emergency room patient transfers (COBRA), physician contracting, medical staff bylaws, Medicare/Medicaid issues, risk management and general operational matters.  Represented physicians and nurses in professional disciplinary actions, patient self-referral limitations and medical practice issues.  Prepared opinions in healthcare antitrust law and other complex areas of health care law.

1990 - 1993:  <u>Medico-Legal Advisor/Assistant Staff Judge Advocate, Chief of Naval Education and Training (CNET)</u>.  Primary assistant in supervising and monitoring CNET's legal program and overseeing all CNET attorneys.  CNET's annual budget exceeded $1.2 billion and had 40,500 permanent staff.  CNET provided all formal education and training for the U.S. Navy.  Assisted in formulating policy, drafting and analyzing proposed legislation and regulations on following subjects: health care, legal assistance (consumer protection), management of legal assets, education, charitable organizations, military justice and other matters.  Reviewed, researched and prepared recommendations on all medical malpractice claims investigations; claims averaged in excess of $120 million per year.  Provided advice and assistance on all health care law issues relating to eleven major medical and dental commands.

1987 - 1989:  <u>Staff Judge Advocate (Counsel), Naval Medical Command, Mid-Atlantic Region Headquarters, Norfolk, Virginia</u>. Counsel for regional health care system that included Virginia; North Carolina; South Carolina; Guantanamo Bay, Cuba; Puerto Rico; Bermuda; and Iceland; included eight hospitals, five major dental facilities and numerous

widely dispersed branch medical and dental clinics, including legal offices staffed by attorneys at three of the major hospitals.

1986 - 1987:  <u>Staff Judge Advocate (In House Counsel), Naval Hospital Portsmouth, Virginia</u>, one of the U.S. Navy's largest teaching hospitals. Only attorney for teaching hospital of approximately 750 bed capacity (approx. 440 active beds), 400 doctors, 17 buildings and several thousand nursing and support staff personnel.

1983 - 1985:  <u>Staff Judge Advocate for the USS MIDWAY (CV-4I)</u>, the United States' only aircraft carrier permanently stationed overseas (in Yokosuka, Japan). Legal advisor for commanding officer and crew of approximately 4,500 men. Prepared all criminal cases for prosecution at courts-martial including direction of government investigators. Advised on various international law and admiralty issues including interpretation of status of forces agreements, laws of armed conflict (including Geneva Conventions) and treaty interpretation. Advised and acted in numerous administrative law matters including claims for and against the government. As <u>Foreign Claims Commissioner</u>, adjudicated and paid foreign claims filed against the United States. Established liaison with judicial, legal, police and diplomatic authorities in foreign ports including Pattaya Beach, Thailand; Pusan, Korea; Manila, Republic of the Philippines; Hong Kong; Singapore; and Sasebo, Japan. Supervised legal office staff of one other attorney, three paralegals and four clerk-typists. Provided personal legal assistance including: domestic relations, wills and estates, paternity, contract disputes, landlord-tenant matters, and consumer protection problems. As <u>Force Judge Advocate for Commander, Carrier Group FIVE</u> provided similar services to the Admiral, his staff and a naval battle group consisting of over 30 ships during the same period.

1980 - 1983:  <u>Military attorney at Naval Legal Service Office (NLSO)</u>, Naval Air Station, Pensacola, Florida. One of sixteen attorneys in office providing legal services to military organizations. Positions held:

--<u>Senior Trial Counsel</u> (Prosecuting Attorney) October 1980 to June 1981. Prosecuted criminal cases at special and general court-martial trials. Supervised other prosecutors and legal support personnel.

--<u>Senior Defense Counsel</u>, June 1981 to November 1981. Represented military clients accused of committing criminal offenses at special and general court-martial trials and at various administrative proceedings. Supervised other attorneys and legal support personnel in this office.

--<u>Head, Administrative Law Department</u>, November 1981 to October 1982. Supervised two other attorneys and up to five other personnel pursuing claims against third parties and investigating/defending claims against the Navy. Issued administrative law opinions and advised area commanders on investigations and administrative proceedings. Prepared litigation reports and conducted other activities in defense of U.S. Navy on Federal Tort Claims Act cases which included: airplane crashes, fires, environmental/hazardous waste claims, accidents and medical malpractice claims.

--<u>Head, Legal Assistance Department</u>, October 1982 to July 1983. Primary duties were to supervise the attorneys and other legal personnel assigned and to provide personal legal services to military and civilians.

--<u>Head Military Magistrate</u>, a part-time quasi-judicial authority appointed by CNET, November 1981 to July 1983. Conducted probable cause/pretrial confinement hearings for military criminal defendants.

### OTHER MILITARY SERVICE

Upon graduation from Tulane University, commissioned as Ensign in U.S. Navy. Graduated from Aviation Flight School. Served as search and rescue pilot and instructor pilot in Helicopter Combat Support Squadron SIXTEEN, 1974 to 1977. Qualified as Helicopter Aircraft Commander.

### BOARDS OF DIRECTORS

Board of Advisers, Armed Services Mutual Benefit Association, a nonprofit
    national service organization (2016-2017)
Board of Directors, Guardian Care Convalescent Center,
    a nonprofit nursing home, Orlando, Florida (1997-2011)
Board of Trustees, National Kidney Foundation of Florida, Inc. (1997-2003)
    - Chairman, 2000 & 2002 U.S. Transplant Games Committee
Board of Advisors, Barry University of Orlando College of Law,
    Orlando, Florida (1998-2007)
Board of Directors, Seminole County Bar Association (2005-2007)
Executive Council, Health Law Section, The Florida Bar (1997-2014)

### OTHER LICENSES, SKILLS AND QUALIFICATIONS

Certified by the Florida Bar as a specialist in the area of Health Law (Board certified August 1, 1996). Recognized as a specialist by U.S. Navy in Health Law/Forensic Science (P-Code) and International Law (G-Code). Certified as a Medical Risk Manager by the American Board of Risk Management, Inc. Commercial Pilot's License (fixed wing and helicopters), instrument rating. Computer literate. Served as Arbitrator on Florida Attorney General's Lemon Law Arbitration Panel 1994-1996.

### OTHER EXPERIENCE

-- <u>Adjunct Professor</u>: Barry University of Orlando College of Law, 2000 to present; University of St. Francis, Graduate School, 1996 to 2010; Webster University Graduate School, 2002 to 2014; Southern Adventist University, 2001; Andrews University, 1996;

University of Central Florida, College of Health & Public Affairs, 1995-1996;  Troy State University;  Golden Gate University;  Pensacola Junior College.

     -- <u>U.S. Senate Internship</u>.  Appointed by U.S. Senator Charles E. Grassley (R.-Iowa), Chairman of the Administrative Practice and Procedure Subcommittee of the Senate Judiciary Committee to intern in 1986.

     -- <u>Congressional Internship</u>.  Served as Congressional intern to U.S. Congresswo-man Lindy C. (Mrs. Hale) Boggs (D.-Louisiana), 1976.

     -- Appointed by Attorney General of Florida as <u>Arbitrator</u> on the Florida New Motor Vehicle Arbitration Board ("Lemon Law Board"), 1994 - 1995.

     -- Member (Former) of <u>Advisory Council on Graduate and Undergraduate Programs</u>, Department of Health Services Administration, University of Central Florida.

## PROFESSIONAL ORGANIZATIONS

American Health Lawyers Association (Former Vice-Chair of SISLIC on Long Term Care)
American Society for Healthcare Risk Management (ASHRM) of the Am. Hospital
      Association (AHA)
American Association for Justice (formerly American Trial Lawyers Association)
Association of Military Surgeons of the United States (AMSUS)
Escambia-Santa Rosa County Bar Association
Florida Bar, The (Executive Council of Health Law Section (HLS);  Business Law Sect.)
Florida Society of Healthcare Risk Managers (FSHRM), subdivision of FHA
International Legal Society of Japan (honorary)
National Association of Employment Law Attorneys (NELA) 2014-present
National Association of Legal Fee Analysis (NALFA) 2015-present
Orange County Bar Association (Chair of Medical-Legal Committee (1996-1998))
Seminole County Bar Association (Board of Directors (2010-2011))
The American Association of Nurse Attorneys (TAANA)

And many others

# GEORGE F. INDEST III

## SELECTED PUBLICATIONS

Author and Editor of 12 Health Law related blogs, including:

The Health Law Blog
The Health Law Firm Blog
The Dentistry Law Blog
The Massage Law Blog
The Medical Education Law Blog
The Medical Marijuana Law Blog
The Mental Health Law Blog
The Nursing Law Blog
The Pharmacy Law Blog
The Vision Law Blog

Frequent contributor to Westlaw Legal Solutions Blog.

G. Indest, "Legal Strategies for Doctors to Fight Bad Online Reviews," 19 Tips to Prepare You For Medicare Audit and Site Visit," in Fla. Medical Business, 10-11 (Mar./Apr. 2013).

G. Indest, "19 Tips to Prepare You For Medicare Audit and Site Visit," in Medical Economics, 47-51 (Dec. 10, 2012).

G. Indest, "How to Prevent Employee Embezzlement," in Medical Economics, 49-56 (Sept. 25, 2012).

G. Indest, The Florida Nursing Law Manual (The Health Law Foundation, Altamonte Springs, Fla., 2008).

G. Indest, "When DOH Investigates: The 25 Biggest Mistakes Physicians Make," in Fla. Medical Business, 12-13 (April 24, 2007).

G. Indest, et al., "Legal Ethics: Part I," in Journal of Nursing Law, Vol. 10, No. 1 (Spring 2005), pp. 21-34.

G. Indest, et al., "Legal Ethics: Part II," in Journal of Nursing Law, Vol. 10, No. 1 (Spring 2005), pp. 35-46.

J. Taraska and G. Indest (editors), <u>The Florida Healthcare Professionals' Medico-Legal Guide</u> (DC Press, Sanford, Fla., 2003). Edited this two volume major legal treatise and personally wrote 13 chapters.

G. Indest, Legal Ethics for the Health Care Lawyer, Chap. 3 in Fla. Bar Health Law Section, <u>Health Law Handbook</u> (2003).

G. Indest and L. Weis, Ethics, Chap. 13 in Fla. Bar, <u>2003 Health Law Certification Review Course</u> (Apr. 2003).

G. Indest, et al., <u>Confidentiality of Medical Records in Florida</u>, (Lorman Education Services, Eau Claire, Wisc., Dec. 2003)

G. Indest and J. Hammond, Overview of the New HIPAA Privacy Requirements, <u>The FOMA Journal</u>, 12-13 (Fla. Osteopathic Med. Assoc., Winter 2002).

G. Indest and J. Hammond, Medical Records in Florida: Duty to Keep Medical Records Confidential (and other chapters), in <u>Legalities of Utilizing and Maintaining Computerized Medical Records in Florida</u> (Lorman Education Services, Eau Claire, Wisc., May 2002)

G. Indest and J. Urbanowicz, Ethics, Chap. 14 in Fla. Bar, <u>2002 Health Law Certification Review Course</u> (Apr. 2002).

G. Indest and J. Hammond, Legal Ethics for the Health Care Lawyer: Guidance and Update, Chap. 13 in Fla. Bar, <u>2001 Health Law Certification Review Course</u> (Apr. 2001).

G. Indest, History, Sources and Overview of Medical Information Confidentiality and Documentation Requirements; Risk Management Issues Relating to Medical Records; Medical Records and Litigation; Electronic Medical Records and Computer Age Concerns; chapters in <u>Confidentiality of Medical Records in Florida</u> (Lorman Education Services, Eau Claire, Wisc., Dec. 2000)

G. Indest & J. Hammond, Representing the .Coms and Health Care Providers: Ethical Issues, Sec. 4 in Fla. Bar, <u>e-Medicine: Legal and Regulatory Issues for Health Care in the Electronic Age</u> (Sept. 2000).

G. Indest, Legal Ethics for the Health Care Lawyer: Guidance and Update, Chap. 13 in Fla. Bar, <u>2000 Health Law Certification Review Course</u> (Apr. 2000).

G. Indest & M. Lowe, Legal Ethics for the Health Care Lawyer, Chap. 14 in Fla. Bar, <u>1999 Health Law Certification Review Course</u> (Apr. 1999).

G. Indest, Subpoenas and Court Orders; Retention and Risk Management; Chapters in <u>Medical Records in Florida: Confidentiality & Health Information Practices</u> (Medical Education Services, Inc., Altoona, Wisc. Aug. 1999).

G. Indest, Confidentiality and Record Keeping Requirements -- Historical and Professional Perspectives;  Electronic Medical Records and Related Issues:  Computerized Records, E-mails, Privacy and Confidentiality;  Protecting Electronic Medical Records;  Litigation Issues for Mental Health Records;  Chapters in Florida Confidentiality of Medical Records for Mental Health Providers (Lorman Education Services, Eau Claire, Wisc., Jul. 1999).

G. Indest & L. Kowalczyk, Home Health Care Mergers and Acquisitions, in 10 Home Health Care Management and Practice 6 (Oct. 1998).

G. Indest & M. Lowe, The Use of Technology in the Practice of Law:  Ethical Problems and Solutions, in Fla. Bar, Health Care in the 21st Century:  Legal Implications of Technology and Medicine in the Future -- Progress, Problems, Dilemmas and Solutions (Sept. 1998).

G. Indest & M. Lowe, Drug and Alcohol Abuse, Testing and Treatment Records;  Medical Records in Litigation;  Risk Management Issues Relating To Medical Records;  chapters in Confidentiality of Medical Records (Lorman Education Services, Eau Claire, Wisc., Jul. 1998).

G. Indest, Applying Informed Consent to the Home Health Care Industry, 9 Home Health Care Management and Practice 17-30 (Oct. 1997).

G. Indest & B. Egolf, Is Medicine Headed for an Assembly Line?  Exploring the Doctrine of the Unauthorized Practice of Medicine, in 6 ABA Business Law Today 32 (July/August 1997).

G. Indest & L. Levin, Credentialing Liability and Managed Care, in Topics in Managed Care:  Recent Developments in the Regulation of Health Care Providers and Managed Care Organizations 11-44 (Lorman Education Services, Eau Claire, Wisc., June 18, 1997).

G. Indest & L. Levin, Discontinuation of Home Care Services:  Patient Abandonment by Any Other Name, 5 Aspen's Health Care Law Bulletin 1, (Aspen, May 1997)

G. Indest, Tax Benefits for Donations of Stock to Expire, to be published in Hosp. News & Fla. Health Care Rep. (Mar. 1997).

I. Rothschild, G. Indest, et al., Recent Developments in Managed Care, Tort & Insurance Law Journal, Vol. 32, p.463 (Winter 1997).

G. Indest & L. Levin, Credentialing Liability and the Managed Care Organization, in Fla. Bar, Managed Care:  Emerging Opportunities, Complexities and Liabilities. (Feb. 1997).

G. Indest, Strategies and Advantages in Managed Care Contracting for Home Health Providers, Baker & Hostetler Seminar Managed Care Contracting for Home Health Agencies (Jan. 1997).

G. Indest, Patient Care Issues in Home Health Care, Chap. 1 in M. Nathanson, Home Health Law Manual (Aspen Publishers Oct. 1996).

G. Indest & R. Siehl, Antitrust and Other Regulatory Concerns Impacting the Formation and Operation of Provider Networks, in Fla. Bar, <u>Networks in Health Care:  PHOs, MSOs, Etc.</u> (Sept. 1996).

G. Indest & L. Levin, Credentialing Liability and the Managed Care Organization, in Tort and Ins. Practice Sect., Am. Bar Ass'n, <u>Liability Issues in Managed Care:  A Guide for Litigators, Corporate Counsel and Risk Managers</u> (May 1996).

G. Indest, New Year Brings Radical Restrictions on Lobbying Efforts for Some Hospitals: (Federal Lobbying Disclosure Act), <u>Hosp. News & Fla. Health Care Rep.</u> (Feb. 1996).

G. Indest, Physicians in Group Practices to Feel Impact of Stark I Regulations, <u>Hosp. News & Fla. Health Care Rep.</u> 29 (Dec. 1995).

G. Indest, Medico-Legal Issues in Detecting and Proving the Sexual Abuse of Children, 15 <u>J. Sex & Marital Therapy</u> 141-60 (Summer 1989).

G. Indest, Medico-Legal Issues in Detecting and Proving the Sexual Abuse of Children, in <u>Legal Medicine 1990</u> 31-52 (C. H. Wecht ed. 1991) (republication of article above).

G. Indest, <u>Handbook for Conducting . . . Investigations Involving Allegations of Medical Negligence</u> (Naval Medical Command, Mid-Atlantic Region, Norfolk, Virg., Sept. 1989).

G. Indest, <u>. . . Investigator's Handbook for . . . Vehicle Accidents . . . and other Nonmedical Incidents in Medical and Dental Treatment Facilities</u> (Naval Medical Command, Mid-Atlantic Region, Norfolk, Virg., Aug. 1989).

G. Indest, Legal Aspects of HCFA's Decision to Allow Recovery from Children for Medicaid Benefits Delivered to their Parents through State Financial Responsibility Statutes, 15 <u>S.U.L. Rev. (Southern University Law Review)</u> 225-352 (1988).

G. Indest, Legal Aspects of HCFA's Decision to Allow Recovery from Children for Medicaid Benefits Delivered to their Parents through State Financial Responsibility Statutes, 28 <u>Soc.Sec.Rep.Ser.</u> 3 (West 1990) (republication of article above).

W. D'Zurilla, G. Indest, et al., Case Concerning Multinational Space Operations in the International Court of Justice between PAU and the Federation of Celestial States, in 1980 <u>Phillip C. Jessup International Law Moot Court Competition</u>, Part II (1981).

Checklist for Conducting Inspections of Medico-Legal and Risk Management Functions of Navy Medical and Dental Treatment Facilities, section in <u>Chief of Naval Education and Training Instruction</u> 5040.3 series.

## GEORGE F. INDEST III

### JURISDICTIONS AND COURTS IN WHICH ADMITTED TO PRACTICE

| JURISDICTION | DATE |
|---|---|
| Louisiana (note: Louisiana Bar Exam taken and passed July 1980).  Admitted to practice in Louisiana | October 30, 1980 |

Louisianan State Bar Association
601 St. Charles Avenue,
New Orleans, Louisiana 70130-3404

| | |
|---|---|
| Florida (note: Florida Bar Exam/Multistate Bar Exam, taken and passed January 1983).  Admitted to practice in Florida | December 29, 1983 |

The Florida Bar
650 Apalachee Parkway
Tallahassee, FL 32301

| | |
|---|---|
| District of Columbia (note: admitted on motion).  Admitted to practice in District of Columbia. | June 26, 1987 |

The Bar Association of the District of Columbia
1819 H Street, N.W., Suite 1250
Washington, D.C. 20006

| COURT AND LOCATION | DATE |
|---|---|
| United States Supreme Court, Washington, D.C.  20543 | February 21, 1984 |
| United States Court of Military Appeals, Washington, D.C.  20442 | June 6, 1983 |
| United States Tax Court, Washington, D.C.  20217 | June 15, 1983 |
| United States Fifth Circuit Court of Appeals (Old), 600 Camp Street New Orleans, Louisiana  70130 | Approx. May 1981 (Court no longer exists) |

United States Fifth Circuit Court of Appeals (New),
  600 Camp Street
  New Orleans, Louisiana                                 October 5, 1981

United States Eleventh Circuit Court of Appeals,
  56 Forsyth Street, N.W.
  Atlanta, Georgia   30303                          October 5, 1981

United States District Court for Eastern District of Louisiana,
  500 Camp Street
  New Orleans, Louisiana   70130                  October 30, 1980

United States District Court for the Middle District of Florida
  80 North Hughey Avenue
  Orlando, Florida  32801                       July 26, 1994

Louisiana Supreme Court,
  301 Loyola Avenue
  New Orleans, Louisiana  70112-1886           October 30, 1980

Florida Supreme Court,
  Tallahassee, Florida   32301               December 29, 1983

District of Columbia Court of Appeals,
  500 Indiana Avenue, N.W.
  Washington, D.C.   20001                 June 26, 1987
(No longer active)

United States District Court for the
  Southern District of Florida
  Federal Courthouse Square
  301 North Miami Avenue, Suite 150
  Miami, Florida 33128                   April 27, 1995
                                  (note:  Currently inactive)

United States Court of Federal Claims
  717 Madison Place, N.W.
  Washington, D.C. 2005-6740              March 16, 1995

United States Court of Appeals for Veterans Claims
  625 Indiana Avenue, NW, Suite 900
  Washington, DC 2004-2950             December 27, 2001

United States District Court for the
  District of Columbia
  333 Constitution Avenue, N.W.
  Washington, DC 20001                  2013 (approximate)

United States District Court for the
  Western District of Louisiana,
  611 Broad Street
  Lake Charles, Louisiana 70601            October 2014

United States District Court for the
  Eastern District of Michigan
  231 W. Lafayette Boulevard
  Detroit, Michigan 48226           January 31, 2017



# UNITED STATES CONSUMER LAW

# ATTORNEY FEE SURVEY REPORT

## 2015-2016



### Ronald L. Burdge, Esq.

## EXHIBIT B

## United States Consumer Law
## Attorney Fee Survey Report 2015-2016

Conducted By

Ronald L. Burdge, Esq.
Burdge Law Office Co. L.A.
8250 Washington Village Drive
Dayton, OH 45458-1850
Voice: 937.432.9500
Fax: 937.432.9503

Email: Ron@BurdgeLaw.com



Attribution, No Derivs
CC-BY-ND

This copyright license allows for redistribution, commercial and non-commercial, as long as all quoted and selected contents are passed along unchanged and with credit to the author.

Copyright © 2017 by R.L.Burdge
June 2017

This publication contains the results of proprietary research.

This publication was created to provide accurate and authoritative information concerning the subject matter covered. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney or expert. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

# Acknowledgments

This work is dedicated to the private and public practice members of the Consumer Law bar and the Judicial officers who decide Consumer Law cases across the United States and its territories, all of whom tirelessly dedicate their careers to helping people find Justice every day in our legal system. Without their support and participation, the research for this publication would not have been possible.

A special thanks is extended to Ira Rheingold, Willard Ogburn, and Jon Sheldon for their constant encouragement of this project since the survey began in 1999. I am also indebted to Edward Boltz for his advice and assistance over the past year. The support, suggestions and comments from countless others over the years have contributed greatly to the result before you.

I am especially grateful to the members of the National Association of Consumer Advocates and the National Association of Consumer Bankruptcy Attorneys and the many friends and supporters of the National Consumer Law Center, and to the Consumer Law bar who participated in the research that formed the foundation of this Survey Report. They are the men and women who tirelessly work in the field of Consumer Law to further the cause of Justice.

Finally, no words could adequately express my thanks to my wife, who guided, supported and encouraged me every day for the decades throughout this work. I could not do what I do, and I would accomplish nothing without her.

Ronald L. Burdge, Esq.
June 2017

1. Introduction

   This Survey Report publishes the results of the United States Consumer Law Attorney Fee Survey for 2015-2016. This Survey Report continues to be the only national survey of Consumer Law practitioners in the United States and has been used in more than 35 jurisdictions, including state and federal courts, the U.S. Court of Federal Claims, the U.S. Department of Justice, the U.S. Department of Labor, and the American Arbitration Association to determine reasonable attorney fee rates, resulting in more than $7.9 million in awards across the United States.

   Attorneys in every state and the U.S. Territories took part in the national survey and the results this year continue the trend of being the most comprehensive since our continuous research work began in 1999.

   The findings cited in this Survey Report are based on a survey employing an online, email, and telephone survey representing about 4,500 members of the National Association of Consumer Advocates and the National Association of Consumer Bankruptcy Attorneys and other known attorneys practicing in the field of Consumer Law identified through Avvo.com, Lawyers.com, and court filings around the country. There were 721 participants in this survey, establishing an approximate 16.0% participation rate. This participation rate was robust. An internet search for similar state bar association surveys located 13 surveys with an average participation rate of 12.4%.[1]

   Because the survey was conducted in 2015 and 2016, the hourly rates and other data reported represent 2015 and 2016 values.

Goals of Survey Report

   The primary goals of this research project have been and continue to be to:

---

   [1] A Google search of the term "Economics of Law Practice Survey," a common title for many bar association surveys, resulted in survey reports with participation rates that could be compared to state attorney totals as follows: Alabama (7.3%), Arizona (16.0%), Florida (1.7%), Iowa (16%), Michigan (11.6%), Mississippi (9.7%), Missouri (9.5%), Nebraska (12.2%), New Hampshire (20.4%), New Mexico (15.1%), Ohio (7.8%), Oklahoma (11.3%), Texas (12.5%).

- provide timely, relevant and accurate data and information to inform and guide practical, management and planning decisions by Consumer Law attorneys, including private and non-private practitioners including the judiciary and government workers
- better understand the demographics of Consumer Law attorneys and their practice
- monitor and document general and key trends in the legal profession, based on previous and present survey research and analysis
- understand how attorney compensation (e.g., hourly rate) is impacted by various variable factors (e.g., years in practice, niche area of practice, experience level, geographic location, and more)
- collect thorough and accurate information on the economic realities associated with the career field to share with the bar, present and potential future attorneys, and the bench
- create a point of reference for future economic surveys of Consumer Law practitioners

## What's New

A number of beneficial changes in format and content are introduced with this edition of the Survey Report.

This What's New section is itself new and intended to provide a central point where changes that appear in the new edition of the Survey Report may be highlighted, explained and contrasted with the last edition. Because of the substantial changes occurring with this edition, this section is presently longer than it is likely to be in future editions of the Survey Report.

This Introduction section contains far greater introductory detail to the areas covered so that the reader can make better and more accurate use of the Survey Report.

The Summary Profile of the Typical U.S. Consumer Law Attorney, section 2, has been expanded to include visual graphic illustrations of key data and to add national data charts.

These visual graphics make for easier recognition of data while the national charts now provide a national data perspective on the data using generally the same

format for presentation of the survey results. Thus, it will be easier for the reader to compare the data from any state or greater metropolitan area with the national data in order to understand where their area stands with respect to the same national data numbers.

For the first time, this Survey Report covers every state, greater metropolitan area, and most non-metropolitan areas in the United States and includes the District of Columbia. The two most heavily populated Territories, Puerto Rico and the U.S. Virgin Islands, are also included in this Survey Report.

Since this survey began in 1999, more localized data reporting has become generally preferred by the Bar. To better serve this continuing shift in focus, the Survey Report has expanded from twelve multi-state regions and 29 individual state Survey Reports, to provide individualized data for each of 50 states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Continuing the trend of providing greater localized data, the survey has expanded its coverage from 46 greater metropolitan areas to 98 greater metropolitan areas, which comprise 64% of the U.S. population.

This change provides the reader with a quick and easy analysis of their particular relevant data on a highly localized approach. It is expected that the resulting analyses will be of greater use to the reader, the profession, the Bar, and the Courts.

Consumer Law is recognized as a specialized field of law by courts[2] as well as often recognized as a specialized field by universities, law schools and the profession itself. As the field has matured, niche specialty areas have developed within the broader field of Consumer Law. Some practitioners and a few courts have expressed a desire to better understand data from within these niche specialty areas.

To that end, now included in each state and greater metropolitan area is a table of Median Rate for Practice Areas for each of Consumer Law's six niche areas, such as Bankruptcy Law, Class Action Law, and others that are further explained below. Providing the median hourly rate for each of these more specific niche areas in the field of Consumer Law may give the reader a starting point upon which to draw inferences

---

[2]

As said by the Ohio 9th District Court of Appeals, "[c]onsumer law is a specialty area that is not common among many legal practitioners." *Crow v. Fred Martin Motor Co.*, 2003-Ohio-1293 (Summit App. No. 21128).

from other state and greater metropolitan data for any given niche area within the overall field of Consumer Law. The State Summary Tables that appear in section 3 list the 25% Median point, the Median point, and the 95% Median points of hourly rates for each state. For the Metropolitan Area Tables in section 4, the tables list only the Median point for each niche area. The 25% and 95% points can be determined in the manner of calculation described below.

As discussed below, there are specific factors that will commonly have a larger impact on an hourly rate than other, less common factors. These larger impact factors more readily cause an hourly rate to vary. To more accurately label these factors which can vary the hourly rate by their application, they have been renamed as Variables. Thus, what was termed as Years Practicing Consumer Law in prior versions of this survey is now termed more accurately as an Experience Variable.

The experience level of an advocate is a primary variable in determining a reasonable hourly rate. The hourly rate data as gauged by years in practice has been expanded from nine to eleven age brackets. The prior ceiling bracket of 31+ years has been increased to 41+. These two additional brackets allow greater analysis of the experience variable of senior attorneys that fall in the 31-35 and 36-40 years in practice bracket.

To better understand the "years in practice" variable and its localized impact on a professional's hourly rate, each greater metropolitan area in this Survey Report is now followed by an Experience Variable table as well as a table of Median Rate for Practice Areas.

The Experience Variable table takes the years in practice of legal practitioners and breaks it down into eleven brackets, generally in five year increments and capped by the elder bracket of 41+ years in practice. The average attorney hourly rate for each bracket is then provided.

The ten states with the largest survey participation provided detailed data that allowed their Survey Reports to include additional data tables, including a Specialty Variable table, Small Firm Size Variable table, and Large Firm Size Variable table.

The Specialty Variable table focuses on the percentage of practice time that is consumed by the practitioner on Consumer Law matters in brackets of ten percentage points from 50% to 100%. The average attorney hourly rate for each bracket is then

provided.

The Small Firm Size Variable table and the Large Firm Size Variable table each take the Experience Variable tables and separate them by law firm size and then examine and report the average attorney hourly rates for each years in practice bracket therein. This allows further contrasting of data between both large and small firm members by their levels of experience.

Survey Report Sections Explained

After this introductory section, the results of this Survey Report are reported in two major data sections. At the beginning of each Section is an explanatory table of the Section's structure and content.

Section 2 of this Survey Report contains the Summary Profile of the Typical U.S. Consumer Law Attorney, a collective approach to the entire survey results which yields a general picture of key aspects of the typical U.S. Consumer Law practitioner in the United States and its territories. It is based on the survey results as a whole and may serve as a benchmark for both larger and local comparisons by the reader.

Section 3 begins the State Summary Tables analyses for each state in the United States, the District of Columbia, Puerto Rico and the U.S. Virgin Islands and includes a table of the Median Rate for Practice Areas for each, reporting the 25% Median, the Median, and the 95% Median hourly rate brackets, as further explained below. This section provides the Survey's analytical approach to each state or area's survey results, which yields a more detailed summary picture of key aspects of the typical U.S. Consumer Law practitioner in each survey state or area.

Section 4 contains data for the greater metropolitan area tables for 98 greater metropolitan areas in the United States. Once again, these selections were made based chiefly on the basis of their larger population count. For each greater metropolitan area, this section contains a similar averages and median summary table as was included in Section 3 and also adds the Median Rate for Practice Areas table and Experience Variable Table (i.e., years in practice) to each greater metropolitan area analysis. This approach allows for far more localized data reported than ever before in our Survey Report. Although the greater metropolitan Median Rate for Practice Areas tables only list the Median point and not the 25% and 95% Median points that are listed in the state

Median Rate for Practice Areas tables, there is a simple and statistically reliable way to calculate those greater metropolitan points if the reader desires to do so in any situation.

Since the Median Rate for Practice Areas provided in Section 3 give the 25% and 95% Median points and the table in Section 4 does not do so, the greater metropolitan area 25% and 95% points can be calculated based on the percentage difference away from the Median point. For example, in the state Median Rate for Practice Areas table for Alabama, the Credit Rights fields for 25%, Median, and 95% list hourly rates of $300, $350, and $700 respectively. In the Birmingham, Alabama greater metropolitan Mediate Rate for Practice Areas table, the Credit Rights field only lists the Median at an hourly rate of $338. Referring to the greater metropolitan table field for Credit Rights shows the Median hourly rate to be $338. The state table field for the Median is $350. The greater metropolitan table field is 96.57% of the state table field number. Applying that percentage to the 25% and the 95% Median points will result in a close approximation of the Birmingham 25% and 95% Median points, e.g. $290 and $676 respectively.

Section 5 explains Survey Techniques in general and those used in gathering the data reported herein.

Section 6 provides a brief discussion of cases employing the use of prior editions of this Survey Report along with a listing of citations to cases which have used or cited the Survey Report since its inception.

Section 7 discusses various cases that have dealt with the actual use of survey data in court proceedings such as fee hearings, with citations.

Section 8 provides biographical information about the Survey Report Editor.

Section 9 provides contact information for the reader's recommendations for future survey data gathering or other suggestion.

Appendix 1 provides the actual survey questions and possible answers for each.

### Niche Areas in the Field of Consumer Law Defined

Consumer Law is recognized as a specialized area of law dealing with issues

arising from transactions involving one or more persons acting as individuals or as a family. Consumer Law as a field of law typically includes niche areas, e.g. bankruptcy, credit discrimination, consumer banking, warranty law, unfair and deceptive acts and practices, and more narrow topics of consumer law such as consumer protection rights enabled by specific statutes such as the Fair Credit Reporting Act, the Uniform Consumer Sales Practices Act, state and federal lemon laws, and many others.

While Consumer Law is a field of law, for greater analysis of the niche areas within Consumer Law the following categorization has been made for purposes of this Survey Report and the Median Rate for Practice Areas tables:

1. Bankruptcy
2. Class Action
3. Credit Rights (FCRA, FDCPA, ECOA, TILA, Credit Discrimination, Credit Reporting, Debt Defense, etc)
4. Mortgage (Foreclosure Defense, RESPA, HOLA, Real Estate, Housing Rights, etc.
5. Vehicles (Autofraud, Lemon Law, Warranty Law, UDAP, Repossession Law, etc.)
6. TCPA
7. Other

## Geographic Areas Defined

Survey participant data has been analyzed and compiled for this Survey Report for all 50 states and the geographic areas of the District of Columbia, Puerto Rico and U.S. Virgin Islands.

This national Survey Report also takes a localized view of the survey data and includes 98 greater metropolitan areas, providing a more detailed, specific and slightly different analysis of the survey data for the reader's review and further analysis.

Generally, a metropolitan statistical area contains a core urban area of 50,000 or more population and includes the adjacent counties or municipalities that have a high degree of social and economic integration, as measured by commuting to work, with the urban core. However, a greater metropolitan area in this Survey Report is not defined the same as in the U.S. Census. The key difference is that in the Census definition of a

metropolitan statistical area (MSA), the MSA may cross state or other governmental borders. In this Survey Report, data responses were confined to state or territorial political boundaries, e.g. in this Survey Report the Chicago greater metropolitan area does not include the northwest Indiana area where Gary, Hammond and other Indiana cities are located which are socio-economically connected to Chicago, Illinois.

In response to requests for even more detailed data, this year's survey added a new question which obtained from each survey participant the specific niche areas of Consumer Law in which the participant regularly practiced. It also added a new question which obtained local geographic location data from each survey participant, e.g., if the respondent regularly practiced in the north, south, east, west, or central area of their particular state or territory.

The responsive data enables an even more narrow and localized analysis to be generated and which provides median-based hourly rate numbers for these niche areas of Consumer Law within the wider field of Consumer Law itself, with a greater focus on geographic locality.

### The Average and the Median: What it Means to You

To help practitioners understand and interpret the data in this Survey Report, a brief explanation of common data terminology in this Survey Report may be useful.

The tables in this Survey Report use some terms whose meaning, while understood by statisticians, may not be clear to attorneys and Judges. The data is presented in measures of central tendency (mean and median) and dispersion or spread (percentiles).

The mean (sometimes called the arithmetic average) is calculated by adding the values of all responses, then dividing by the number of responses.

For example, five responses are reported, 3, 4, 6, 8 and 12. The average is calculated by adding their values (3 + 4 + 6 + 8 + 12 = 33), then dividing by the number of responses (5). Thus, the average is 33 / 5 = 6.6.

The median has a different meaning.  It is the middle value of a series of values, which is initially rank-ordered from low to high. By definition, half the numbers are

greater and half are less than the median. Both mean and median values are used throughout this Survey Report to denote the measure of central tendency, e.g., as a pointer for the central area of survey results without regard to the average.

Statisticians variously agree that using the median as a statistic reduces the effect of extreme outlier numbers (extremely high or low values, such as 12 in the above example) while the average does not do so because it takes all numbers into account.

As an example of how using a median affects the above numbers, the same five responses are reported, 3, 4, 6, 8 and 12. The median is the middle number of the order of distribution, 6. Note, however, that the average of this same distribution of numbers is 6.6. Depending on the set of numbers under analysis, the mean (i.e., the average) may be incrementally higher or lower than the actual median of that set of numbers.

The median literally is the value in the middle. It represents the mid way point in a sequence of numbers. It is determined by lining up the values in the set of data (for example, in this fee survey that would be all of the individual fee rate responses logged in the survey) from the smallest to the largest. The one in the dead-center position is the median number.

The median is not the average of the numbers because you don't add anything in the list, but you merely determine the center of the list. Some statisticians say that using the mean (instead of the average) gives less weight to the individual numbers that are on the outer limits of the survey responses and thus it is more likely to direct the survey to the real center of the responses.

The median result of a set of numbers may be higher or lower than the average of that same set of numbers. Because the median number is commonly not the same as the average number, being either slightly above or below it, we are including both the average and the median results for key data points in the survey.

The dispersion of data around the median, which is at the 50th percentile point, is reported in three increments in several places throughout the Survey Report:

♦   25th percentile (what statisticians call the lower quartile); one-fourth of the number values are less and three-fourth of the values are more than this value

◆   75th percentile (the upper quartile); three-fourths of the number values are less and one-fourth are more than this value

◆   95th percentile; ninety-five percent of the number values are less and only five percent are more than this value.

Interpreting the Findings: Primary and Minor Variable Factors

An hourly rate may commonly be impacted by several factors, including years of practice, firm size, practice location, and degree of practice concentration. These four variables are known to have a significant impact on an hourly rate and in this survey are identified as the primary variables.

Depending on the specific situation, there are other variable factors that historically are often of less impact than the primary variables, such as advertising, personal client relationships, and other remote factors. These minor variables may apply in any given instance but almost always to a lesser variable degree than the primary variables. Most often these minor variables are highly individual to the practitioner at hand.

Thus, the information presented here on the factors that are primary variables will be indicative of a particular attorney's reasonable hourly rate but there may be times when a further, more detailed analysis of minor variable factors may be useful to further modify the result of the primary variable factors in a specific situation. Such further analysis is not possible in this Survey Report but would require an individual inquiry and even then the impact of such individualistic minor variables is doubtful.

A Summary Profile of the Typical U.S. Consumer Law Attorney is presented at the outset of this Survey Report in Section 2, in order to provide a summary profile of the average U.S. Consumer Law attorney and their practice. It may be viewed as the average of all survey responses nationwide. Charts appear here which are employed in the state and greater metropolitan sections, enabling a local versus national comparison of data.

The Experience Variable Tables now appear only in the Metropolitan Area Tables and present an analysis of the impact that years in practice in Consumer Law has on the average attorney hourly rate. Each greater metropolitan area has its own table of survey

results with the levels of experience, e.g., years in practice, being divided into 11 time frames with less than one year and more than 41 years bracketing the outer limits at each end. One might think that longevity of practice would dictate an increasingly higher hourly rate and these tables report survey results that test that assumption and, in some cases, variations are observed.  Economic trends outside of this survey may test that assumption even further but are not considered in this survey.

The State and Metropolitan Summary Tables in Sections 3 and 4 are presented to give an overview of the practice of Consumer Law lawyers for each listed state, area or greater metropolitan area. Note the use of both average and median results in these sections, with the median used to reduce the effect of extremely high or low values in some data. These tables also show the difference in survey results when comparing the average hourly rates and the median hourly rates, a factor considered by some statisticians to arrive at what they consider to be more neutral or accurate survey results.

## Data Gathering Methodology

To help practitioners understand and interpret the data in this Survey Report, a brief explanation of the data gathering methodology may help.

In designing the United States Consumer Law Attorney Fee Survey, the author considered all procedure, question and design factors enumerated and discussed in three primary sources: *Evaluating Survey Questions: An Inventory of Methods* prepared by the Subcommittee on Questionnaire Evaluation Methods of the Statistical and Science Policy Office in the U.S. Office of Management and Budget (January 2016), and *Evaluating Survey Questions* by Doctor Chase H. Harrison of Harvard University's Program on Survey Research, and *Methods for Testing and Evaluating Survey Questions* by Stanley Presser et al, Public Opinion Quarterly Vol. 68, Issue 1 (March 2004).

Survey results are based on the results of a survey that was fielded during 2015 and 2016 and consisting of twelve key data questions. The survey was administered via email, ordinary mail, facsimile and telephonic data gathering and invitations to an internet-based online questionnaire. The survey was closed when data compilation began in early 2017.

In compiling this Survey Report, a valuable contribution was made by members of the National Association of Consumer Advocates and the National Association of Consumer Bankruptcy Attorneys and Consumer Law attorneys across the United States and its territories who were invited to participate during 2015 and 2016.

The entire active membership of the National Association of Consumer Advocates and the National Association of Consumer Bankruptcy Attorneys, along with other known Consumer Law practitioners from around the United States and its territories were surveyed.

Invitations to participate were also randomly sent to attorneys disclosed through internet search engine results conducted on a national level as well as randomly selected physical telephone book specialty listings where available. Invitations to participate were also randomly sent to attorneys identified through court filings in various jurisdictions and bar association directories.

As with prior surveys, an on-line survey service, along with email and telephone, was utilized to gather and tabulate the results with safeguards in place to limit data input to one participant per survey. Additional direct telephone survey input was also utilized.

Our similar studies have been undertaken annually since 1999. The objective of these studies has been to determine the demographics of Consumer Law private practitioners, including attorney hourly billing rate, firm size, years in practice, concentration of practice, primary and secondary practice area prevalence, paralegal billing rates and other data of use to the profession.

The collected information has been condensed into this national reference to provide useful data and benchmarks to assist Consumer Law attorneys as they manage their practice and Courts as they seek to determine applicable reasonable hourly rates in cases before them.

The data is reported in various tables below, allowing the reader to consider the data from several viewpoints of selected factors or criteria. Nevertheless there may be situations where a practitioner desires a data analysis and report specific to their practice. If a more detailed analysis of data for any geographic or practice-specific situation is necessary, it can be performed upon request directed to the editor of this work.

Data Analysis Methodology

The data analysis relies on descriptive statistics, including averages, medians, and percentiles. The average, also known as the mean, is calculated by adding all of the respondents' numerical answers for a particular item and dividing by the total number of respondents. The median, also known as the midpoint, is the point at which half of the responses are above and half are below that number.

The percentiles, e.g., 25th, 75th, and 95th, represent the point in the range of responses at which 25%, 75%, 95% of the responses occur for a specific question. For example, the 95th percentile hourly rate amount is the hourly rate amount at which 95% of the reported hourly rate amounts were below and 5% of the hourly rate amounts were above.

Items may not sum up to 100% due to rounding. Data is indicated as a dash mark (e.g., " - ") if no data or if uncurably deficient data was reported.

Data is presented for all of the United States and the geopolitical areas of the District of Columbia, Puerto Rico and the U.S. Virgin Islands. Some survey data quantities allowed for greater analysis reporting than other geographic areas because not all reported at high levels of data responses. In almost all table fields, survey participation yielded sufficient data for reliable analysis without inference. In the State Summary Tables, the minimum state participation level was 5 survey participants for analyses to be performed. In the Metropolitan Summary Tables, the minimum greater metropolitan participation level was 3 survey participants for analyses to be performed. In a Median Rate for Practice Areas table, if one field had no survey participant then the remaining six other practice area fields in that table would be considered and the median result entered in the field that had deficient participation.

This was a robust survey, e.g., there are more than 4,153 fields of data calculation in this Survey Report but only three data fields lacked sufficient input from survey participants when the survey was closed, which represents 0.0007224 of all data presented. The results for these three data fields were imputed using a variation of the scientifically accepted standard Maximum Likelihood Estimation (MLE) method statistical approach, which estimates the parameters of a statistical model given observations by finding the parameter values that maximize the likelihood of making the observations given the parameters. This approach assumes a uniform prior distribution

of the parameters, which was verified to exist by examination of the presented data in this survey. The common variation of MLE employed here used multiple but related fields as sources of data for imputation, invoking multiple fields of related known data to arrive at imputed data for the three missing fields. Data fields used for imputation purposes were limited to geographically contiguous data fields because of the established multi-state regional data relationships observed over our years of previous survey data analyses. Simply put, data movement has always been more relational within a region than when contrasted between regions.

In performing calculations of state data for any field in any table, several rules applied for the imputation of missing or deficient data.

First, if the current survey state data was deficient then using the prior survey result the editor looked first for a field with data in the prior survey that was contiguous to the data deficient field in the current survey. Next, the editor determined the percentage change from one data field to the next data field in the prior survey and then applied that percentage change to the current survey to calculate the percentage change that would occur from the same known contiguous field to the data deficient field in the current survey. Finally, if there was none then the editor would use the average of all contiguous states' data in the deficient field to determine the entry for the deficient data field.

In the greater metropolitan Median Rate for Practice Areas table, if any data field was deficient then the state data for that field is used. In performing calculations for the greater metropolitan Experience Variable Table, if greater metropolitan data was deficient then the current survey uses the state data result for that field where data is deficient. In performing the greater metropolitan calculations for any field, if greater metropolitan data is deficient then the current survey uses the state data result for that field.

Error Rate

Before this publication, a hand selected review was conducted of selected data received during this survey and compared with the data reported in the previous survey. The results indicate an error rate of less than one percentage point at the 95% confidence level in the present Survey Report, a number substantially lower than the published error rate of similar types of surveys.

Section 508 Compliance

The United States Consumer Law Attorney Fee Survey is the only survey of its type that is Section 508 Certified. This means that the survey program on which this survey runs meets all current U.S. Federal Section 508 certification guidelines.

Section 508 is a Federal law that outlines the requirements to make online information and services accessible to users with disabilities. All Federal agencies are required to use 508 certified software and technologies when available.

The Voluntary Product Accessibility Template was used in the design of the survey. VPAT's purpose is to assist Federal contracting officials and others in making preliminary assessments regarding the availability of commercial "Electronic and Information Technology" products and services with features that support accessibility. The VPAT was developed by the Information Technology Industry Council (ITI) in partnership with the U.S. General Services Administration (GSA).

Use of the VPAT means that this survey is built on programming that includes a text element for every non-text element of the survey web page, web pages are designed so that all information displayed with color is also available without color, all parts of the survey are readable without having to open another window, and other techniques to enable disabled persons to fully participate in every aspect of the Fee Survey.

The editor deems it important that the survey reach the broadest range of potential respondents possible in order to provide the reader with the most accurate results. By including survey feedback from the disabled demographic, the survey ensures a more representative population is able to participate so that all demographics may be included in the survey results.

2. Summary Profile of the Typical U.S. Consumer Law Attorney

National Summary Profile Data

This section graphically illustrates and contrasts key data derived from the survey when viewed only from a national approach. Emphasis here is on the average Consumer Law attorney in the United States without regard for any specific survey factor or geographic location. More specific data results appear in the next section below.

While the vast bulk of survey participants predominantly practiced Consumer Law, nearly a quarter of participants primarily practiced Bankruptcy Law. A wide variety of other areas of primary practice were noticed, supplemented in part by Consumer Law work.

## Q1 Below is a list of practice areas. Please select the practice area that represents the largest percentage of your practice time.



United States Consumer Law Survey Report 2015-2016

16

The average Consumer Law attorney continues to supplement their work in this field primarily with Bankruptcy work by an average of 24.8% which is up significantly from the 14.5% in the last Survey Report.

Nevertheless, when Bankruptcy Law is taken out of the analysis, it is clear that about two-thirds of all Consumer Law attorneys supplement their Consumer Law work with varying degrees of other legal work in other areas of practice.

The percentage of actual practice time expended solely on non-Bankruptcy Law Consumer Law matters by the average practitioner is holding consistent, with 49.2% of all respondents reporting their practice to consist of 90-100% Consumer Law issues, a figure still far below that reported four years ago when 82.7% was the level reporting their practice to fall in the 90-100% range for Consumer Law issues. An analysis of the possible impact of this degree of focus is contained in the state-specific Specialty Variable Tables that appear in Section 3 of this Survey Report.

## Q2 What percentage of your practice time is devoted to Consumer Law, not including Bankruptcy Law?



## Florida, Orlando

| Firm Size | 3.0 |
|---|---|
| Median Years in Practice | 12.0 |
| Concentration of Practice in Consumer Law | 95.4 |
| Primary Practice Area | Consumer Law |
| Secondary Practice Area | Real Estate |
| Last Time Rate Change Occurred (months) | 17.3 |
| Median Number of Paralegals in Firm | 1.5 |
| Average Paralegal Rate for All Paralegals | 103 |
| Average Attorney Rate for All Attorneys | 406 |
| 25% Median Attorney Rate for All Attorneys | 300 |
| Median Attorney Rate for All Attorneys | 375 |
| 75% Median Attorney Rate for All Attorneys | 500 |
| 95% Median Attorney Rate for All Attorneys | 700 |

## Median Rate for Practice Areas

| | Median |
|---|---|
| Attorneys Handling Bankruptcy Cases | 263 |
| Attorneys Handling Class Action Cases | 500 |
| Attorneys Handling Credit Rights Cases | 388 |
| Attorneys Handling Mortgage Cases | 438 |
| Attorneys Handling Vehicle Cases | 375 |
| Attorneys Handling TCPA Cases | 350 |
| Attorneys Handling Other Cases | 388 |

Experience Variable Table

| Years Practicing Consumer Law | Average Attorney Hourly Rate |
| --- | --- |
| <1 | 200 |
| 1-3 | 250 |
| 3-5 | 258 |
| 6-10 | 350 |
| 11-15 | 400 |
| 16-20 | 467 |
| 21-25 | 494 |
| 26-30 | 538 |
| 31-35 | 555 |
| 36-40 | 700 |
| 41+ | 500 |

Large Firm Size Variable Table

| Years in Practice | Average Attorney Hourly Rate |
|---|---|
| <1 | - |
| 1-3 | 275 |
| 3-5 | 283 |
| 6-10 | 325 |
| 11-15 | 488 |
| 16-20 | 600 |
| 21-25 | 500 |
| 26-30 | 533 |
| 31-35 | 450 |
| 36-40 | 700 |
| 41+ | - |

## New York, New York City

| Firm Size | 2.7 |
|---|---|
| Median Years in Practice | 19.0 |
| Concentration of Practice in Consumer Law | 86.1 |
| Primary Practice Area | Consumer Law |
| Secondary Practice Area | Bankruptcy |
| Last Time Rate Change Occurred (months) | 16.1 |
| Median Number of Paralegals in Firm | 2.8 |
| Average Paralegal Rate for All Paralegals | 108 |
| Average Attorney Rate for All Attorneys | 490 |
| 25% Median Attorney Rate for All Attorneys | 350 |
| Median Attorney Rate for All Attorneys | 500 |
| 75% Median Attorney Rate for All Attorneys | 675 |
| 95% Median Attorney Rate for All Attorneys | 725 |

## Median Rate for Practice Areas

| | Median |
|---|---|
| Attorneys Handling Bankruptcy Cases | 500 |
| Attorneys Handling Class Action Cases | 575 |
| Attorneys Handling Credit Rights Cases | 413 |
| Attorneys Handling Mortgage Cases | 588 |
| Attorneys Handling Vehicle Cases | 425 |
| Attorneys Handling TCPA Cases | 413 |
| Attorneys Handling Other Cases | 600 |

Experience Variable Table

| Years Practicing Consumer Law | Average Attorney Hourly Rate |
|---|---|
| <1 | 300 |
| 1-3 | 300 |
| 3-5 | 300 |
| 6-10 | 338 |
| 11-15 | 413 |
| 16-20 | 567 |
| 21-25 | 583 |
| 26-30 | 725 |
| 31-35 | 544 |
| 36-40 | 638 |
| 41+ | 375 |